A05A1341. CITY OF ATLANTA v. HARPER.
(623 SE2d 553)

PHIPPS, Judge.

In April 2003, Robert Harper was terminated from Atlanta's Office of the City Internal Auditor. Harper, who had been a member

of the City's classified civil service system throughout his employment with the City, appealed to the City's Civil Service Board. Before the Board, the City argued that Harper's termination was in accordance with a particular City ordinance. The Board rejected that argument, determined that the termination was improper, and reinstated Harper. The City petitioned the superior court for a writ of certiorari, challenging the Board's decision. The superior court concluded that the Board had not erred and denied the petition. The City appeals.

"The writ of certiorari shall lie for the correction of errors committed by any inferior judicatory or any person exercising judicial powers. . . ."[1]

> The appropriate standard of review to be applied to issues of fact on writ of certiorari to the superior court is whether the decision below was supported by any evidence. On appeal to this Court, our duty is not to review whether the record supports the superior court's decision but whether the record supports the initial decision of the local governing body or administrative agency.[2]

"Viewed in a light most favorable to [Harper], the prevailing party before the [B]oard, and with every presumption in favor of the [B]oard's decision indulged,"[3] the record supports the Board's decision. Therefore, we affirm.

In September 2001, Leslie Ward was appointed to the post of City Internal Auditor. She soon determined that the scope of auditing being performed fell short of what the City Charter required. Specifically, Ward assessed that the Office was conducting only compliance and financial auditing, but needed to include performance auditing. Upon acquainting herself with the skills and qualifications of the existing staff members, Ward concluded that the Office staffing needed restructuring. Because of budgetary constraints, adding personnel was not an option. There were 11 employees in the Office, including Ward and her deputy, neither of whom would be affected by the anticipated restructuring. Ward prepared a proposal to eliminate the remaining classified civil service positions in the Office (including Harper's) and create nine new unclassified positions. After discussing the proposal with the City's Audit Committee, to which she

---

[1] OCGA § 5-4-1 (a); see *City of Atlanta Govt. v. Smith*, 228 Ga. App. 864, 865 (1) (493 SE2d 51) (1997).

[2] *Smith*, supra (citation and punctuation omitted).

[3] *Dept. of Corrections v. Shaw*, 217 Ga. App. 33 (456 SE2d 628) (1995) (citation and punctuation omitted).

reported, and with certain City Human Resources staff members, Ward included the proposal in the Office budget request for the upcoming year 2003. The City budget, which was approved by the City Council and Mayor, encompassed the proposal.

Harper and his co-workers were told that their jobs were being abolished and that they could compete — along with applicants from the general public — for new jobs. Among the new jobs were positions that entailed performance auditing: two positions as performance audit manager, two positions as senior performance manager, and two positions as performance auditor. Harper applied for these performance auditing positions. He had earned a college degree in accounting and a certification in government financial management from the American Organization of Governmental Accounting, had been employed by the City for over twenty-five years conducting financial compliance and operational audits for all City departments, and had by then reached the level of audit manager with three direct-report auditors.

The initial step in the application process for such positions required each applicant to submit a standard City employment application, a cover letter describing how his or her skills and experience satisfied the requirements of the position sought, a re-sume, and an academic transcript. Sixty applicants, including Harper, were selected to continue with the next step in the application process, which required them to respond to a case study, a hypothetical fact situation calling for a performance audit. Harper was eliminated after he submitted his response.[4] Separated from employment with the City, Harper appealed to the Board.

At the Board hearing, the City claimed that Harper's termination was authorized by City Ordinance 114-379,[5] entitled "Layoff or reduction in force." The City specifically cited subsection (a) of that ordinance, which states,

> A reduction in force (RIF) occurs when an agency is obliged to demote, separate or furlough one or more employees because of lack of work, shortage of funds or reorganization. The cause of reduction in force may come from legislative action or from decisions of the head of the agency or some official who has been authorized to make such decisions.

---

[4] Of the nine employees, three were offered a new position, two retired, one resigned, and three were terminated.

[5] Chapter 114 Personnel, Article IV Civil Service, Division 12 Separation, Section 114-379.

The City claimed that the City Council and Mayor had authorized a RIF in the Office, citing the City budget for 2003 and the fact that the City Mayor was a member of the City's Audit Committee. It conceded that subsection (m) of Ordinance 114-379 provided that "[a]n employee shall have the right to appeal to the civil service board a failure to follow procedure in the administration of the RIF," but claimed that, in administering the RIF within the Office, it had followed all applicable procedures.

Harper countered that Ward had become dissatisfied with his job performance and that the City was misapplying Ordinance 114-379 (a) to mask a wrongful severance. He pointed out that he was a classified civil service worker and argued that the City was not authorized to get rid of him under the pretext of a RIF.[6] Citing rules of statutory construction, he argued that Ordinance 114-379 (a) contemplated a need to reduce the size of a work force as a result of some obligation and asserted that there was no obligation on the City's part to reduce the size of the Office. In addition, Harper alleged that, with regard to his termination, the City had failed to comply with certain requirements of Ordinance 114-379.

Thus, hotly contested before the Board was whether Harper's termination was in accordance with Ordinance 114-379. The Board concluded, "[T]he process began with eleven (11) employees working in this Department and ended with eleven (11) employees working in the Department. Accordingly, in keeping with [Ordinance 114-379 (a)], this Department was not authorized to separate [Harper] and his dismissal is improper." The Board ordered Harper's reinstatement.

In this appeal, the City maintains that Ordinance 114-379 (a) authorizes it to discharge even a classified civil service employee anytime it decides to reorganize its workforce, regardless of whether the staff size is decreased. And it maintains that it followed all requisite procedures in its reorganization of the Office. But even assuming, without deciding, that Ordinance 114-379 (a) can be used to restructure a workforce as was done in the Office, the record supports the Board's determination that Harper's termination was not in accordance with that provision and thus was not authorized.

First, there is evidence that, in terminating Harper, the City violated subsection (b) of Ordinance 114-379 prohibiting a RIF from being used "for the purpose of dismissing or demoting permanent status employees whose job performance is unacceptable. The progressive discipline process and adverse action procedures should be

---

[6] See generally *City of Atlanta v. Mahony*, 162 Ga. App. 5 (289 SE2d 250) (1982) (employees in the City's classified civil service can be terminated only in accordance with due process; abolition of a position may violate constitutional guarantees where such action is taken as a subterfuge merely to single out and discharge particular employees).

applied when problems of unacceptable performance arise." Ward was asked at the Board hearing why Harper had not been retained in the Office. She answered,

> In addition to the case study, the other work that Mr. Harper had done did not demonstrate the potential to do the kind of analysis, that of complex issues and the kind of, yes, the kind of statistical and other analysis and research that goes into the audits that we are now doing. The performance audits we are now doing go far beyond the compliance auditing that Mr. Harper demonstrated his ability to do.

According to Harper, Ward began voicing dissatisfaction with his work around May 2002. Referencing a recent audit, she warned him that if she had to do his work, she did not need him. The following December, Ward notified Harper that because of his work on that audit, he would not be offered a position as a performance audit manager or a senior performance auditor, but that he might be considered for a position as a performance auditor. The following month, however, Ward informed him that, because of that same audit, he would get no position at all. Nevertheless, Harper applied for all three types of performance auditing positions.

Meanwhile, Harper provided to Ward another audit that he and one of his direct reports had drafted. Ward accepted it, but complained to Harper that the draft audit did not fully meet her expectations. Subsequently, a news reporter appeared in Ward's office with a copy of the draft audit in hand. Harper recounted that Ward thereafter confronted him, demanding him to explain how the report had been leaked to the media. When Harper answered that he was dumbfounded, she vowed to investigate and discipline the person responsible. Ward's investigation led her to strongly suspect that one of Harper's direct reports was the culprit. Although Ward testified that she took no disciplinary action, she gave Harper a two-week termination notice the month after the media leak. Thus, there was direct and indirect evidence that Harper's severance had resulted from unacceptable work performance — a circumstance expressly outside the purview of Ordinance 114-379 (a).

Second, the evidence shows that, in terminating Harper, the City failed to comply with subsection (g) of Ordinance 114-379. It provides that "[a]ll individuals within each affected class will compete for the remaining positions in that class *based on retention points*,"[7] which as defined by that subsection, are "determined by two factors: length of

---

[7] (Emphasis supplied.)

service and performance appraisal." But there is nothing in the record indicating that the two-step process employed to restructure the Office incorporated retention points. Instead, the record contains Ward's testimony that she had refused to sign Harper's performance appraisal prepared for her review because she believed that the criteria used did not reflect the work required by the Office. Ward made it clear that Harper was eliminated from the competition for the positions "based on the range of applicants, internal as well as external, and the whole range of application materials that he presented, and [Ward's] experience with his work."

Finally, assuming for the sake of argument that there was a bona fide RIF in the Office and that the City complied with applicable mandates, there is evidence that Harper's termination simply did not fall under it. Conflicting with the City's position that it discharged Harper because of a "reorganization" are its personnel form terminating Harper and its notice of Harper's separation to the Georgia Department of Labor. In neither document did the City cite "reorganization" as a reason for discharging Harper. Rather, those documents, both of which Ward signed, stated that Harper's termination was due to "lack of work/budget reduction."

Conflicting with a "lack of work" claim, however, is evidence that new auditing positions were created contemporaneously with the abolishment of old auditing positions. Furthermore, Harper's last supervisor, who had obtained one of the performance auditing positions, testified that Harper was "absolutely" capable of conducting performance audits. Moreover, she testified that despite Ward's characterization of the work done in the restructured Office as "performance" audits, the Office continues to conduct financial compliance audits.

Conflicting with the City's claim of a "budget reduction" is Ward's testimony that the restructuring did not reduce the total number of staff employed, that the newly created positions paid higher salaries than those abolished, that the Office budget had not been reduced, and that the sum of the salaries for the newly created nine positions was actually higher than the sum of the salaries for the old nine positions.

Thus, there was evidence that Harper's separation was not "because of lack of work, shortage of funds or reorganization"[8] — the only circumstances expressly authorized by Ordinance 114-379 (a).

*Judgment affirmed. Andrews, P. J., and Mikell, J., concur.*

---

[8] Ordinance 114-379 (a).

DECIDED NOVEMBER 18, 2005.

*Linda K. DiSantis, Kimberly M. Patrick*, for appellant.
*Mary J. Huber*, for appellee.